## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**TWO PNY 32 GIGABYTE THUMB DRIVES ATTACHED BY A SILVER CHAIN,**<br><br>**THREE PNY 64 GIGABYTE THUMB DRIVES ATTACHED BY A SILVER CHAIN,**<br><br>**ONE SONY VAIO NOTEBOOK COMPUTER, SERIAL NO. PCG8X2L,**<br><br>**TOSHIBA INTERNAL HARD DRIVE, SERIAL NO. MK3021GAS,**<br><br>**WESTERN DIGITAL EXTERNAL HARD DRIVE, SERIAL NO. WCASU0563527,**<br><br>**WESTERN DIGITAL MY BOOK EXTERNAL HARD DRIVE, SERIAL NO. WCC4E2073010,**<br><br>**ACER NOTEBOOK COMPUTER, SERIAL NO. NXM8SAA007343001F77200,**<br><br>**FANTOM DRIVE GREENDRIVE EXTERNAL HARD DRIVE, SERIAL NO. GD1W0EU,**<br><br>**GATEWAY NOTEBOOK COMPUTER, SERIAL NO. 45-518-726-628,**<br><br>**HITACHI INTERNAL HARD DRIVE, SERIAL NO. DK23E-60,**<br><br>**and,**<br><br>**IBM TWO GIGABYTE MICRO DRIVE, SERIAL NO. KHNN8936,**<br><br>**CURRENTLY LOCATED AT 301 7TH STREET SW, WASHINGTON, D.C.** | **Mag. No.:** _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Gershon R. Ross, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent, currently assigned to the Office of the Chief Security Officer, Department of Homeland Security in Washington, D.C.  I have worked in law enforcement for 25 years.  I have been employed as a Special Agent with the Department of Homeland Security for four years.  I previously worked as a Special Agent with the Naval Criminal Investigative Service for approximately 10 years and as an Investigator with the Office of the Director of National Intelligence for 4 years.  Prior to that, I was an Investigator with the U.S. Department of Labor for approximately 5 years.  My Law Enforcement training includes the Criminal Investigation Training Program (CITP) conducted at the Federal Law Enforcement Training Center (FLETC).  I have previously participated in multiple search warrants and have also acted as the affiant on search warrants.  During my collective law enforcement career I have conducted numerous criminal investigations.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a:

   a.  Two PNY 32 gigabyte thumb drives attached by a silver chain,

   b.  Three PNY 64 gigabyte thumb drives attached by a silver chain,

   c.  Sony VAIO notebook computer (serial number PCG8X2L)

2

d.  Toshiba internal hard drive (serial number MK3021GAS),

e.  Western Digital external hard drive (serial number WCASU0563527),

f.  Western Digital My Book external hard drive (serial number WCC4E2073010),

g.  Acer notebook computer (serial number NXM8SAA007343001F77200),

h.  Fantom Drive GreenDrive external hard drive (serial number GD1W0EU),

i.  Gateway notebook computer (serial number 45-518-726-628),

j.  Hitachi internal hard drive (serial number DK23E-60), and

k.  IBM two gigabyte micro drive (serial number KHNN8936),

(hereinafter the "Device") which are currently located at 301 7th Street, S.W., in Washington, D.C

in the custody of the Department of Homeland Security.

5.      The applied-for warrant would authorize the forensic examination of the Device for

the purpose of identifying electronically stored data particularly described in Attachment B.

## TECHNICAL BACKGROUND

6.      Based on my training and experience, and information acquired from other law

enforcement officials with technical expertise, I know the terms described below have the following

meanings or characteristics:

7.      "Computer" means "an electronic, magnetic, optical, electrochemical, or other high

speed data processing device performing logical or storage functions, and includes any data storage

facility or communications facility directly related to or operating in conjunction with such device."

18 U.S.C. § 1030(e)(1).  A "notebook" computer refers to a type of computer designed to be

portable and about the size of a large notebook.  "Computer software" or "computer programs"

refer to digital information which can be interpreted by a computer and its related components to

direct the way they work.  By way of example, computer programs may include a device's

operating system that enables one to activate or store computer files, a word processor that allows one to create documents, and a web browser that allows one to send and receive information with webpages over the Internet.  Portable media storage devices, such as thumb drives, micro flash drives, and internal or external hard drives, can be connected to computers and provide additional space for storing computer files.

8.      A cellular telephone ("cell phone") is a handheld wireless device used or designed for voice communication through radio signals.  Cell phones send signals through networks of transmitter/receivers called "cells," enabling communication with other cell phones or with traditional "landline" telephones.  Cell phones may also support non-cellular forms of wireless communication—such as WiFi and Bluetooth—and may include global positioning system ("GPS") technology used to determine the physical location of the device.

9.      Cell phones normally include a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice calls, however, cell phones also offer a broad range of other capabilities.  These may include storing names and phone numbers in electronic address books or "contacts"; storing information on personal calendars; sending, receiving, and storing "text messages" and "email" messages; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; and accessing and downloading information from the Internet.  Furthermore, newer cell-phone models – often called "smartphones" – allow users to obtain and use computer programs specially designed for mobile devices called "apps."  Countless apps performing a vast array of functions are available to cell-phone users.  Apps might allow users to generate and store special types of information, facilitate communication with other people, interface with websites on the Internet, and much more

beyond these examples.  Just as call logs store information about what voice calls are made, cell phones also store information for each app.

10.     A "tablet" is a mobile computer – typically larger than a cell phone and smaller than a notebook computer – that is primarily operated by touching the screen.  Like cell phones, they function as wireless communication devices and typically offer a broad range of capabilities that include storing names and phone numbers in electronic address books or "contacts"; storing information on personal calendars; sending, receiving, and storing "text messages" and "email" messages; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; and accessing and downloading information from the Internet.  Similar to smart phones, tablets typically contain apps that can perform a wide array of functions and store data associated with those functions.

## THE INVESTIGATION AND PROBABLE CAUSE

11.     The Department of Homeland Security Office of the Chief Security Officer are investigating, *inter alia*, possible violations of 18 U.S.C. §§ 930(a) (possessing firearm or dangerous weapon in Federal facility), 930(b) (possessing firearm or dangerous weapon in Federal facility with intent to commit crime), and 924(b) (interstate transport of firearm with intent to commit crime), and D.C. Code § 22-4504 (carrying a pistol without a license).  From personal observation, talking to law enforcement officers, and reviewing reports, along with my training and experience, I have learned the following.

12.     The Department of Homeland Security Nebraska Avenue Complex (NAC) is located at 3801 Nebraska Avenue NW in Washington, D.C.  It houses the Secretary and Deputy Secretary of Homeland Security as well as approximately 3,000 federal employees.  The NAC is leased by the U.S. Government and is assessed as Facility Security Level (FSL) Five – the highest security level

possible according to the Interagency Security Committee Standards.  Examples of other FSL Five

facilities are the White House, Pentagon, and U.S. Capitol.

13.     JONATHAN L. WIENKE ("WIENKE") is an employee of the Department of

Homeland Security.  He works at the NAC as a Management and Program Analyst in the Office of

Intelligence and Analysis.  This position does not require or involve the carrying of a weapon or

handcuffs.  WIENKE holds a Top Secret Clearance with access to Sensitive Compartmented

Information.  He lives at 207 East Martin Street, Martinsburg, West Virginia.  He was born

September 12, 1970.  He has no criminal history.

14.     At approximately 7:30 a.m., on June 9, 2016, WIENKE approached a NAC

pedestrian entrance gate and was randomly selected for a search of his person and belongings.

Enhanced Security Measures ("ESM") had been implemented at the NAC two days earlier.  These

ESM included random searches of DHS employees entering the NAC.[1]  During the random

screening of WIENKE, the following items were found on WIENKE's person or inside his

backpack: (1) one folding knife with an approximately 3-inch blade, (2) two handheld radio

communication devices, (3) one can of O/C incapacitating spray labeled "law enforcement," (4) one

handheld infrared device designed to view heat signatures, (5) one pair of black handcuffs, (6) one

handcuff key, (7) one black Samsung tablet, and (8) one black HTC cell phone.

15.     After security officers seized the knife and O/C spray, WIENKE was allowed into

the NAC facility.  At approximately 9:00 a.m., Special Agent Eric Mann and Federal Officer

Tammy Smith proceeded to WIENKE's workspace (a workstation with four cubicles) within NAC

---

[1] The security posture at the NAC is reviewed at least biweekly by the NAC Security Threat Working Group
("NSTWG").  Decisions regarding NAC security are based on threat information received from multiple sources,
including official DHS notifications and credible information received from interagency intelligence and/or law
enforcement sources.

Building 19.  At that time, a meeting of senior DHS officials was occurring in close proximity to WIENKE's workspace.  NAC Building 19 contains classified information and is itself classified as a Sensitive Compartmented Information Facility ("SCIF").

16.     WIENKE was not in his cubicle when Special Agent Mann and Federal Officer Smith arrived, but WIENKE arrived soon thereafter.  WIENKE was wearing a DHS polo shirt, khaki cargo pants, and brown outdoor boots.  Special Agent Mann identified himself and requested permission to search WIENKE's workspace.  WIENKE said "yes."  Special Agent Mann then asked WIENKE if he had any weapons on his person.  WIENKE said "no."  Special Agent Mann then asked WIENKE for permission to search him.  WIENKE said "ok."  Special Agent Mann patted down WIENKE and discovered a .22 caliber five-shot revolver loaded with five .22 caliber hollow-point rounds in WIENKE's right-front pants pocket.  Special Agent Mann heard WIENKE utter an audible expletive when the firearm was discovered.  Another handcuff key was found in WIENKE's back pocket during a subsequent search.

17.     Through a records search, I learned that WIENKE owns a permit to carry a concealed weapon in West Virginia.  However, this permit is not valid for Washington, D.C., or for federal facilities.  Furthermore, I learned that WIENKE does not have a license to carry a firearm in Washington, D.C., or within federal facilities.  WIENKE was arrested by Metropolitan Police Department ("MPD") officers and subsequently charged in the Superior Court of the District of Columbia with carrying a pistol without a license.  During a post-arrest interview, WIENKE indicated that he had been unaware that he had the weapon on him.  WIENKE appeared before a magistrate judge on June 10, 2016, and was held pending a detention hearing.  He was later released after a detention hearing on June 13, 2016.

18.     From June 9 to June 10, 2016, law enforcement agents executed a federal search warrant at WIENKE's residence at 207 East Martin Street in Martinsburg, WV.  During this search, law enforcement agents found 19 firearms and a suspected firearm noise suppresser or "silencer" that was attached to a Walther .22 caliber pistol.  Law enforcement agents also discovered unusually large amounts of ammunition, estimated to be between 10,000 and 30,000 rounds of various calibers.  On June 11, 2016, Special Agent Don Lockhart of the Bureau of Alcohol, Tobacco, and Firearms opined that the noise suppresser attached to the Walther .22 caliber pistol was an unlicensed silencer possessed in violation of 26 U.S.C. §§ 5812 and 5841.  On June 24, 2016, ATF Firearm and Ammunition Technology Division confirmed that the device is an unregistered silencer.

19.     During execution of the search warrant at 207 East Martin Street, law enforcement agents also discovered items that could be used to make improvised explosives.  Within the kitchen area, they found sections of plastic pipe sawed to lengths of approximately one foot, lead ingots, a hand saw, and a type of glue used to attach pipe end caps or fittings.  Elsewhere in the house, law enforcement agents found seven large boxes that contained magnesium shavings, thermite, and oxidizers.  Through consultation with Special Agent Lockhart who was present during the execution of the search warrant, I am aware that these materials could be used to assemble an explosive device.

20.     In addition to the abovementioned firearms, rounds of ammunition, and items that could be used to make improvised explosives, law enforcement agents discovered the following electronic devices within WIENKE's residence:

    a.   Two PNY 32 gigabyte thumb drives attached by a silver chain,

    b.   Three PNY 64 gigabyte thumb drives attached by a silver chain,

    c.   Sony VAIO notebook computer (serial number PCG8X2L),

    d.   Toshiba internal hard drive (serial number MK3021GAS),

    e.   Western Digital external hard drive (serial number WCASU0563527),

    f.   Western Digital My Book external hard drive (serial number WCC4E2073010),

    g.   Acer notebook computer (serial number NXM8SAA007343001F77200),

    h.   Fantom Drive GreenDrive external hard drive (serial number GD1W0EU),

    i.   Gateway notebook computer (serial number 45-518-726-628),

    j.   Hitachi internal hard drive (serial number DK23E-60), and

    k.   IBM two gigabyte micro drive (serial number KHNN8936).

The above electronic devices were transferred to DHS Evidence Custody located at 301 7th Street SW in Washington, DC.  Based on my training and experience, I am aware that these devices have been stored in a manner such that, to the extent material to this investigation, their contents are in substantially the same state as they were when the devices first came into the possession of law enforcement.

      21.     Based on my training and experience, I know that people who commit crime in Washington, D.C., often use cell phones, tablets, or computers in ways that reveal their location, activity, and state of mind before, after, or while engaging in criminal activity.  For example, this may include location information (*e.g.*, GPS data), the contents of computer files (*e.g.*, notes about a criminal scheme), computer program or app usage information (*e.g.*, web searches and browsing history), and images or video recordings relevant to the criminal activity.  Furthermore, I know from training and experience that call logs, text messages, emails, and information from any

computer program or app for electronic communication frequently include communications that shed light on the person's location, activity, and state of mind relevant to criminal activity under investigation.  In particular, from training and experience, I know that people who make improvised explosives or other weapons as part of a criminal scheme frequently access the Internet using cell phones, tablets, or computers in order to conduct research, collaborate with others about such criminal activity, and obtain supplies relating to such criminal activity.  Based on training and experience, I know that information relating to such cell phone, tablet, or computer usage may be stored on those devices or related portable media storage devices.

22.     Based on my training and experience, I know that people who possess guns and other contraband in Washington, D.C., often use cell phones, tablets, or other electronic devices to capture and store images or video recordings of such contraband – sometimes called "trophy photos."  They also frequently share these images or video recordings with associates using email, text messaging, or other forms of electronic communication, such as social networking websites. Similarly, they often refer to their guns and other contraband in text messages, emails, or other electronic communications that are carried out using cell phones, tablets, or computers.  Based on training and experience, I know that information relating to such cell phone, tablet, or computer usage may be stored on those devices or related portable media storage devices.

23.     Based on my training and experience, the fact WIENKE was carrying a pair of two-way radios indicates that criminal activity being committed or planned by WIENKE may have involved one or more coconspirators.  From training and experience, I know that crimes carried out by more than one person usually involve some amount of communication among those involved. This may involve working out details of and preparing to carry out a premeditated crime, or simply arranging to meet up someplace where an unplanned crime would later occur.  Either way, I know

from training and experience that cell phones, tablets, and computers are frequently used for this purpose and that a cell phone, tablet, or computer recovered from a participant in such criminal activity often contains evidence of communication among accomplices.  Such communications and other files may then be stored on those devices or related portable media storage devices, such as thumb drives or hard drives.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

29.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device.  This information can sometimes be recovered with forensics tools.

30.     In addition, to the extent that the Device does have some capabilities that are similar to the capabilities of laptops, tablets, or other traditional computers, there is probable cause to believe that things that were once stored may still be stored there, for at least the following reasons:

     a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

     b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used

11

by an active file—for long periods of time before they are overwritten.  In addition, a

computer's operating system may also keep a record of deleted data in a "swap" or

"recovery" file.

    c.    Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer has

been used, what it has been used for, and who has used it.  To give a few examples,

this forensic evidence can take the form of operating system configurations, artifacts

from operating system or application operation, file system data structures, and

virtual memory "swap" or paging files.  Computer users typically do not erase or

delete this evidence, because special software is typically required for that task.

However, it is technically possible to delete this information.

    d.    Similarly, files that have been viewed via the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache."

    24.    *Forensic evidence.*  As further described in Attachment A, this application seeks

permission to locate not only electronically stored information that might serve as direct evidence of

the crimes described on the warrant, but also forensic evidence that establishes how the Device was

used, the purpose of its use, who used it, and when.  There is probable cause to believe that this

forensic electronic evidence might be on the Device because:

    a.    Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a file

(such as a paragraph that has been deleted from a word processing file). Furthermore,

to the extent that the Device does have some capabilities that are similar to the

capabilities of laptops, tablets, or other traditional computers:  Virtual memory

paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs and, chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

26. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

27.     I submit that this affidavit supports probable cause for a search warrant authorizing

the examination of the Device described in Attachment A to seek the items described in Attachment

B.

                                        Respectfully submitted,

                                        _____
                                        Gershon R. Ross
                                        Special Agent
                                        Office of the Chief Security Officer
                                        Department of Homeland Security

Subscribed and sworn to before me
on June 24, 2016:

                                        _____
                                        DEBORAH A. ROBINSON
                                        UNITED STATES MAGISTRATE JUDGE
                                          FOR THE DISTRICT OF COLUMBIA

15